## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRADY MCDONOUGH, Derivatively on Behalf of VROOM, INC., <br><br> Plaintiff, <br><br> v. <br><br> PAUL J. HENNESSY, DAVID K. JONES, ROBERT J. MYLOD, JR., SCOTT A. DAHNKE, MICHAEL FARELLO, LAURA W. LANG, and LAURA G. O'SHAUGHNESSY, <br><br> Defendants, <br><br> -and- <br><br> VROOM, INC., <br><br> Nominal Defendant. | Case No. <br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br><br> **JURY DEMANDED** |

Plaintiff Brady McDonough ("McDonough" or "Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Stockholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Vroom, Inc. ("Vroom" or the "Company") against the Individual Defendants (defined herein) seeking to remedy their breaches of fiduciary duties and other violations of law between June 9, 2020 and March 3, 2021, (the "Relevant Period"). Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon information and belief based on the investigation of undersigned counsel, which includes, without limitation: (a) review and analysis of public filings made by Vroom with the United States Securities and Exchange Commission

1

("SEC"); (b) review and analysis of press releases and other publications disseminated by Vroom; (c) review of news articles, stockholder communications, and postings on Vroom's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with and publicly available from a related consolidated securities fraud class action pending in this Court captioned, *In re: Vroom, Inc. Securities Litigation,* Case No. 1:21-cv-02477- PGG (the "Securities Class Action"); and (e) review of other publicly available information concerning Vroom and the Individual Defendants (as defined below).

## NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action asserting claims for breach of fiduciary duty and other violations of law against certain officers and members of the Company's Board of Directors (the "Board").

2.      Vroom is an e-commerce company that allows customers to buy and sell used cars online.

3.      Vroom became a public company through an initial public offering on June 9, 2020 (the "IPO"). Prior to the IPO, Vroom significantly reduced its inventory and furloughed approximately one-third of its workforce to account for an expected drop in demand caused by the COVID-19 pandemic. When those demand trends sharply reversed, the Individual Defendants caused Vroom to consistently represent to investors throughout the Relevant Period that it was well-positioned to take advantage of extraordinarily high consumer demand for online used car purchases.

4.      In Vroom's IPO Offering Materials,[1] the Company claimed that it was "currently

---

[1] On June 9, 2020, Vroom filed a prospectus for the IPO with the SEC on Form 424B4, which incorporated and

building [its] inventory to take advantage of [its] position and value proposition in the used automotive market" and was positioned to take advantage of "enhanced opportunities arising from greater consumer acceptance of [its] business model as a result of the COVID-19 disruptions." Vroom stated that in April 2020 it "began to acquire new inventory from both auctions and consumers, with a primary focus on high-demand models that [it] believe[d] w[ould] convert at target margins" and that it "intend[ed] to strategically build [its] inventory levels in the near term to return to and ultimately exceed pre-COVID-19 levels."

5.     The IPO Offering Materials also discussed how Vroom's business had "grown significantly as [it had] scaled [its] operations," and that this "growth [was] not attributable to a single innovation or breakthrough" but was instead due to "multiple strategies that serve as points" on the Company's "Growth Flywheel," shown below:



6.     As Vroom explained in its public filings, "[s]ales conversion drives revenue growth

---

formed part of the Registration Statement for the offering (the "IPO Offering Materials").

and is an output of the acceleration of every point on the growth flywheel."

7.     Vroom also touted the purported advantages of what it called its "asset-light" business strategy, whereby Vroom shunned its own need for ownership of assets in favor of a business model that relied heavily on contracts with third-party service providers to assist in facilitating functions that would typically be controlled in-house. Vroom claimed that outsourcing these critical functions of its business reduced both risk and capital investment, thereby improving Vroom's ability to scale its business while avoiding risk.

8.     Per its asset-light business strategy, Vroom outsourced, among other things, its "Customer Experience" function, the spoke on the Company's Growth Flywheel that operated Vroom's primary call center and performed almost all necessary functions required in the process whereby a potential Vroom customer turned into an actual Vroom customer.

9.     The Customer Experience function was outsourced to significant Vroom investor Dan Gilbert's ("Gilbert") Rock Connections LLC ("Rock Connections"), under an agreement signed by Defendant Paul Hennessy ("Hennessy"), Vroom's Chief Executive Officer ("CEO") and a director.

10.     Despite outsourcing the Customer Experience function, the Individual Defendants ensured that the agreement between Vroom and Rock Connections gave the Company and the Individual Defendants unrestricted access to monitor the customer service being provided by Rock Connections to Vroom's customers. Specifically, Vroom's agreement with Rock Connections, among other things, (a) mandated that Rock Connections provide all customer service in accordance with Vroom's policies and procedures; (b) required that Rock Connections "enter and save all required information" in extraordinarily granular detail in Vroom's customer relationship

management ("CRM") system, making it accessible to Vroom's senior executives and management; (c) allowed Vroom control over Rock Connections' staffing and training of staff; and (d) allowed Vroom's senior executives and management unfettered access to monitor the customer support being provided to potential Vroom customers, including monitoring capabilities for both voice and data with or without Rock Connections' knowledge, the allowance of onsite visits by Vroom personnel to Rock Connections' facility, the provision of weekly reports to Vroom management, and a requirement for weekly meetings between representatives of Rock Connections and Vroom. As a result, the Individual Defendants were well aware of the Customer Experience being provided at Vroom.

11.     During the Relevant Period, the Individual Defendants asserted that the spokes on Vroom's Growth Flywheel were driving increased sales, touting Vroom's ***"[e]normous inventory selection"*** and ***"[e]xceptional customer support"*** while flatly asserting on multiple occasions that the Company offered ***"an exceptional ecommerce experience for [its] customers."***[2] The Individual Defendants also told investors that, consistent with Vroom's Growth Flywheel, "customer experience" was "fundamental to the growth of [its] business" and that Vroom maintained a "deep[] commit[ment] to creating an exceptional experience for [its] customers."

12.     Analysts and investors were keenly aware of Vroom's asset-light strategy and outsourcing of critical functions, and they monitored any developments with respect to those third-party relationships given their importance to Vroom's Growth Flywheel and ability to convert customers and increase sales. Based on the foregoing representations, Vroom's stock price skyrocketed from its June 2020 IPO price of $22 per share to a close of $73.87 per share on

---

[2] All emphasis in bold and italics added unless otherwise indicated.

September 1, 2020. Exactly one week later, and only a few weeks from the end of the third quarter of 2020, Vroom took advantage of its rapidly escalating share price by announcing a September 2020 follow-on stock offering (the "September 2020 SPO"). Vroom also provided an update to investors on Vroom's operational and financial results, raising the Company's third quarter financial guidance and telling investors that the Company was performing "better than expected."

13.     Vroom filed with the SEC a registration statement on Form S-1 for the September 2020 SPO on September 8, 2020 (the "SPO Registration Statement"), followed by the filing of the prospectus for the September 2020 SPO on September 11, 2020 (the "SPO Prospectus") (together with the SPO Registration Statement, the "SPO Offering Materials"). The SPO Offering Materials made many of the same representations to investors that were made in connection with the IPO, including attributing the Company's growth to the spokes on Vroom's Growth Flywheel, again touting the Company's "[e]normous inventory selection" and "[e]xceptional customer support," and representing Vroom's purported ability to offer a superior Customer Experience as a key factor from "traditional auto dealers and the peer-to-peer market."

14.     As with the IPO Offering Materials, the SPO Offering Materials made detailed representations about the Customer Experience offered by Vroom, stating that the Company had "partnered with a leading customer experience management provider to operate [its] primary call center" which enabled it "to centralize [its] contact center services, ensure consistency in customer interactions, increase conversion and maximize operating efficiencies." Based on these representations and others, the Company sold 10.8 million shares of its common stock at $54.50 per share for nearly $590 million in gross offering proceeds in the September 2020 SPO.

15.     In reality, the Company's touted Customer Experience spoke on its Growth

Flywheel was a failure, which prevented Vroom from capitalizing on a robust market for online used car sales and also forced Vroom to sell off the excess inventory it had amassed at fire sale prices. In fact, Vroom's Customer Experience had been in a downward spiral since as early as January 2020, over five months before the Company's IPO and over eight months before the September 2020 SPO.

16.     The Better Business Bureau of Greater Houston and South Texas (the "BBB"), which is the centralized location for Vroom's business, has found that, "[b]eginning in January 2020, BBB began receiving complaints and customer reviews [about Vroom] which exhibited several different patterns" including complaints from Vroom customers asserting that: (a) "the vehicle[] they purchased from photos was not the vehicle they received;" (b) "[w]hen the vehicle was received it had either body damage, interior was dirty, discolored or damaged or all of the above;" (c) damaged "cars were delivered at night, so damages were not noticed at delivery;" and (d) "cars were left in a parking lot or driveway at night with the keys left in them." Further, "[c]onsumers also stated they were having customer service and communication issues when trying to reach out to the company to address their concerns," "were not receiving the necessary paperwork to get their car registered," were experiencing "delayed delivery in receiving their car," and/or were experiencing "issues concerning their trade-in." The BBB further stated that "[s]ince January [2020], the pattern of [Vroom] complaints has not trended down but has actually increased," with "new patterns of complaints" in June 2020 focused on "warranty issues, deceptive Carfax issues and/or wrecked cars being sold."

17.     Based on the overwhelming number of complaints and the type of customer service issues being reported to it, the BBB initiated proceedings to revoke Vroom's BBB accreditation.

7

On September 2, 2020, just before Vroom announced the September 2020 SPO, the BBB board of directors revoked Vroom's accreditation due to its failures to adhere to and abide by BBB standards and duly notified Vroom of its action. However, the September 2020 SPO Offering Materials made no mention of the BBB proceedings to revoke Vroom's accreditation or the BBB board's vote to do so. Rather than be truthful, the Individual Defendants chose to mention the BBB only in the context of a generic statement that consumer complaints posted on "consumer platforms such as the Better Business Bureau" "could" diminish consumer confidence in the Company, "irrespective of the [ ] validity" of any such complaints. Currently, Vroom remains unaccredited and the BBB has assigned Vroom a rating of "F", the lowest possible letter rating it can assign to a business.

18.     Overall, Vroom's disastrous Customer Experience constituted a massive undisclosed roadblock to sales conversion on the Company's Growth Flywheel that was having a materially negative impact on the Company's business and operations. The representations made by the Individual Defendants concerning Vroom's Customer Experience and the importance of its increased inventory levels during the Relevant Period were false and misleading at the time they were made.

19.     On November 11, 2020, the truth was partially revealed when Vroom announced its third quarter 2020 financial results, which disclosed that Vroom expected to suffer sharply higher losses in the fourth quarter of 2020, with adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA") losses projected to increase from $36 million in the third quarter of 2020 to at least $44 million and as high as $52 million. The midpoint being $48 million was a 33% sequential increase. On this news, the Company's stock price decreased to

$35.49 on November 12, 2020, a 13% decrease from the previous trading day's closing price of $40.80.

20.     The truth fully emerged on March 3, 2021 when Vroom announced its fourth quarter and full year financial results, revealing operational issues and financial results far worse than those previously disclosed to investors. For the fourth quarter of 2020, Vroom suffered a net loss of $60.7 million, a 41.9%year-over-year increase. Also, Vroom suffered a $55.9 million adjusted EBITDA loss during the quarter, which was $3.9 million above the range provided by the Individual Defendants. The Company's press release further disclosed that Vroom had achieved only $1,821 total gross profit per ecommerce unit, which was $229 below the range provided by previous guidance. Moreover, Vroom generated only $878 gross profit per vehicle, which represented a 13% decline year-over-year.

21.     Throughout the Relevant Period, the Individual Defendants made materially false and misleading statements and omissions regarding the Company's business and operations. Specifically, the Individual Defendants failed to disclose that: (a) Vroom's inventory growth had far outpaced the capabilities of its existing sales and support personnel, creating a logistical bottleneck that threatened the Company's profits, the value of its existing inventory and its ability to achieve positive cash flows; (b) Vroom's lack of adequate sales and support staff had resulted in a degraded Customer Experience and lost sales opportunities; (c) as a result of (a) and(b) above, Vroom needed to invest tens of millions of dollars in bolstering its sales and support and logistics networks, materially impairing the Company's short-term profitability; and (d) as a result of (a)-(c) above, Vroom was poised to suffer accelerating losses and increased negative cash flows, despite a robust online used car market. Indeed, contrary to specific representations the Individual

Defendants made to Vroom's investors, the Company was never "well positioned to navigate the challenges presented by the COVID-19 crisis and take advantage of shifting consumer buying and selling patterns in favor of ecommerce."

22.     The Individual Defendants breached their fiduciary duties of loyalty, good faith, due care, oversight, and candor by knowingly engaging in the deceptions alleged herein.

23.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, Vroom has sustained damages as described below.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 on two grounds. First, such jurisdiction exists because Plaintiff's state law claims are dependent on the resolution of substantial questions of federal law. Specifically, Plaintiff alleges that the Individual Defendants breached their fiduciary duties to Vroom and its shareholders by allowing Vroom to violate the federal securities laws. Second, the federal contribution claims asserted herein arise under and pursuant to the provisions of the Sections 10(b) and 21(D) of the Securities Exchange Act (the "Exchange Act"), 15 U.S.C. § 78(j)(b) and 15 U.S.C. § 78u-4(g). Plaintiff also asserts pendant common law claims under 28 U.S.C. § 1367. This action is not a collusive action designed to confer jurisdiction on the court of the United States that it would not otherwise have.

25.     Venue is proper in this District because the Company's principal place of business is in this District and the Individual Defendants have been involved in business in this District. Further, Defendants' actions have had an effect in this District and the federal Securities Class Action is ongoing in this District.

## THE PARTIES

26.     Plaintiff McDonough is a stockholder of Vroom, was a stockholder of Vroom and has been a stockholder of Vroom continuously since June 2020.

27.     Defendant Vroom is a Delaware corporation with its principal executive offices at 1375 Broadway, Floor 11, New York, New York 10018. Vroom's shares trade on the NASDAQ under the ticker symbol "VRM."

28.     Defendant Hennessy has served as the Company's CEO and as a director since June 2016. For the fiscal year ended December 31, 2020, he received $4,315,077 in total compensation from the Company. Defendant Hennessy is named as a defendant in the Securities Class Action.

29.     Defendant David K. Jones ("Jones") served as the Company's Chief Financial Officer (" CFO") from November 2018 to September 2021. Defendant Jones is named as a defendant in the Securities Class Action.

30.     Defendant Robert J. Mylod, Jr. ("Mylod") has served as a Company director since September 2015 and is Chairperson of the Board and Chair of the Audit Committee. Defendant Mylod is named as a defendant in the Securities Class Action.

31.     Defendant Scott A. Dahnke ("Dahnke") has served as a Company director since July 2015. Defendant Dahnke is named as a defendant in the Securities Class Action.

32.     Defendant Michael J. Farello ("Farello") has served as a Company director since July 2015. Defendant Farello is named as a defendant in the Securities Class Action.

33.     Defendant Laura W. Lang ("Lang") has served as a Company director since May 18, 2020. She serves as a member of the Audit Committee. Defendant Lang is named as a defendant in the Securities Class Action.

34.     Defendant Laura G. O'Shaughnessy ("O'Shaughnessy") has served as a Company director since May 18, 2020. For the fiscal year ended December 31, 2020, she received $257,934 in total compensation from the Company. Defendant O'Shaughnessy is named as a defendant in the Securities Class Action.

35.     Collectively, Defendants Hennessy, Jones, Mylod, Dahnke, Farello, Lang, and O'Shaughnessy, are referred to herein as the "Individual Defendants."

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

36.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and continues to owe Vroom and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care and was/is required to use his/her utmost ability to control and manage Vroom in a fair, just, honest, and equitable manner. The Individual Defendants were/are required to act in furtherance of the best interests of Vroom and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

37.     Each Individual Defendant owed and continues to owe Vroom, and its stockholders, the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

38.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Vroom, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial positions with Vroom, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly held

company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's business practices, operations, finances, financial prospects, compliance policies, and internal controls so that the market price of the Company's stock would be based on truthful and accurate information.

39.     To discharge their duties, the Individual Defendants were/are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Individual Defendants were required to, among other things:

a)     ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

b)     conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

c)     remain informed as to how Vroom conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

d)     truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

40.     The Company also has adopted a Code of Business Conduct and Ethics (the "Code") which required, in relevant part, the following:

The continued success of Vroom is dependent upon our customers' trust and we are dedicated to preserving that trust. Employees owe a duty to Vroom, its customers and shareholders to act in a way that will merit the continued trust and confidence of the public.

Vroom will comply with all applicable laws and regulations and expects its directors, officers and employees to conduct business in accordance with the letter, spirit and intent of all relevant laws and regulations and to refrain from any illegal, dishonest or unethical conduct.

*      *      *

## **Company Books and Records**

Transparency is a critical element of trust. That need for transparency is absolute in all company documents – with employees, customers, and our financial books and records. It is our policy to make full, fair, accurate, timely and understandable disclosure in compliance with all applicable laws and regulations in all reports and documents that the Company files with, or submits to, the Securities and Exchange Commission and in all other public communications made by the Company.

All employees must complete all Company documents accurately, truthfully, and in a timely manner, including all travel and expense reports. When applicable, documents must be properly authorized. You must record the Company's financial activities in compliance with all applicable laws and accounting practices. The making of false or misleading entries, records or documentation is strictly prohibited. You must never create a false or misleading report or make a payment or establish an account on behalf of the Company with the understanding that any part of the payment or account is to be used for a purpose other than as described by the supporting documents.

41.     In addition to these duties, Audit Committee members during the Relevant Period,

Defendants Mylod and Lang (referred to herein as the "Audit Committee Defendants") had the

following purpose and responsibilities per the Audit Committee Charter:

The purpose of the Audit Committee (the "Committee") is to assist the Board of Directors (the "Board") of Vroom, Inc. (the "Company") in its oversight of the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company.

*      *      *

## Duties and Responsibilities

### Interaction with the Independent Auditor

*Appointment and Oversight.* The Committee is directly responsible for the appointment, compensation, retention and oversight of the work of the independent auditor (including resolution of any disagreements between Company management and the independent auditor regarding financial reporting) and any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or related work or performing other audit, review or attest services for the Company, and the independent auditor and each such other registered public accounting firm must report directly to the Committee. The Committee, or the Chair of the Committee, must pre-approve any audit services, including but not limited to internal control-related services, and any non-audit services provided to the Company by the independent auditor, unless the engagement is entered into pursuant to appropriate preapproval policies established by the Committee or if such service falls within available exceptions under SEC rules.

\*       \*       \*

### Financial Statements and Disclosures

*Audit and Financial Reporting Problems*. The Committee must discuss separately with the independent auditor and management any audit problems, financial reporting issues or difficulties in connection with the preparation of the Company's financial statements and management's response.

\*       \*       \*

Form 10-Q Review. The Committee must review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" for inclusion in the Company's Quarterly Report on Form 10-Q.

### Other Duties and Responsibilities

*Review of Earnings Releases*. The Committee must review and discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

\*       \*       \*

*Review of Code of Business Conduct and Ethics*. The Committee must periodically

consider and discuss with management and the independent auditor the Company's Code of Business Conduct and Ethics (the "Code") and the procedures in place to enforce the Code. The Committee must also consider and discuss and, as appropriate, grant requested waivers from the Code brought to the attention of the Committee, though the Committee may defer any decision with respect to any waiver to the Board.

## SUBSTANTIVE ALLEGATIONS

### THE COMPANY OVERVIEW

42.     The Company first formed in 2013 when it was launched as "Auto America." In 2014, the Company transitioned into a technological platform and changed its name to Vroom. In December 2015, Vroom acquired Texas Direct Auto Inc ("TDA").

43.     Vroom operates in three business segments: (i) Ecommerce, which represents retail sales of used vehicles through Vroom's ecommerce platform; (ii) TDA, which represents retail sales of used vehicles from the Company's physical location located in Stafford, Texas; and (iii) Wholesale, which represents sales of used vehicles through wholesale auctions.

44.     For the year ended December 31, 2020, Vroom's Ecommerce segment accounted for 67.4% of the Company's revenues, while its Wholesale and TDA segments represented 18.1% and 14.5% of its total revenues, respectively.

### VROOM'S "ASSET-LIGHT" BUSINESS STRATEGY

45.     Prior to its IPO, Vroom touted the purported advantages of its "asset-light" business strategy. Vroom's business is centered around being "asset-light," meaning Vroom owns relatively little property. Vroom states that this strategy keeps fixed costs down and allows it to be financially flexible. Vroom only owns one of its vehicle reconditioning centers ("VRC"), and has 13 third-party VRCs spread across the country, thus Vroom passes on some of the risks and costs to the operators who run those facilities. At the end of 2019, Vroom had just $7.8 million in property

and equipment and generated nearly $1.2 billion in revenue.

46.     In contrast, Carvana, another e-commerce car selling company, owns its reconditioning centers as well as the logistics network that brings cars to and from customers and its reconditioning centers, and its trademark vending machines. Carvana had $543.5 million in property and equipment at the end of 2019, and the company generated $3.4 billion in revenue.

47.     In the IPO Offering Materials, Vroom asserted its "asset-light strategy" was "fundamental to [its] business model" and noted that the Company's "future growth strategies [were] focused on developing [its] ecommerce business without the need for capital investment in physical retail locations."

48.     Vroom described its asset-light strategy as a "combination of ownership and operation of assets by us with strategic third-party partnerships." Vroom further claimed that this approach provided "flexibility, agility and speed…without taking on…unnecessary risk and capital investment," while also driving "improved unit economics and operating leverage." Vroom also claimed that it applied this asset-light approach "to the third-party value-added products [it sold] to customers, which enable[d] [it] to generate additional revenue streams without taking on the risk associated with underwriting vehicle financing or protection products." In other words, by outsourcing certain critical functions of its business, Vroom asserted to investors that its asset-light business model reduced both risk and capital investment, thereby improving Vroom's bottom line while simultaneously reducing risk.

49.     Pursuant to this asset-light business strategy, Vroom outsourced portions of its critical functions, including its: (a) reconditioning facilities, which performed reconditioning of vehicles in Vroom's inventory to prepare them for sale; (b) logistics operations, which handled

delivery of Vroom's cars in inventory to customers throughout the United States; (c) customer financing, which provided vehicle financing to Vroom's customers; and (d) Customer Experience team, which operated Vroom's primary call center and performed most every action necessary to consummate the sale of a car to a Vroom customer. Vroom has represented that its "third-party customer experience center" handles "the substantial majority of inquiries, sales, purchases and financings of [its] vehicles in [its] ecommerce business," and even customers who wish to trade in a vehicle have to "interact with [Vroom's] customer experience team in order to complete their transaction."

50.     With regard to its "Customer Experience Team," Vroom told investors that with regard to outsourcing this function it had partnered with "a leading customer experience management provider" that enabled Vroom to "centralize [its] contact center services, ensure consistency in customer interactions, increase conversion and maximize operating efficiencies." While Vroom represented that its Customer Experience was "partially dependent" on this third-party Customer Experience management provider over which it had "limited control," this was not true. Vroom had complete control over its third-party Customer Experience management provider.

**V**ROOM'S **C**USTOMER **S**ERVICE **C**ONTRACT **W**ITH **R**OCK **C**ONNECTIONS LLC

51.     For Vroom's outsourced Customer Service, the Company entered into a contract with prominent investor Gilbert's Rock Connections. In an August 22, 2017, press release titled "*Vroom Partners with Rock Connections to Drive Growth and Customer Experience*," Vroom announced that it had partnered with the Detroit-based company, Rock Connections, to handle Vroom's Customer Experience function. In the press release, Vroom described Rock Connections as a "strategic sales and marketing agency focused on outbound and inbound client service," and

Defendant Hennessy asserted that "[b]y partnering with Rock Connections, [Vroom could] ensure that [its] clients receive[d] immediate responses, while also providing the expert advice that Vroom customers demand." The press release continued:

> ***Car buyers and resellers no longer need to put their lives on hold to purchase or sell their cars. They can quickly and easily purchase a vehicle online and have it delivered anywhere in the United States***. Conversely, sellers can have their car appraised online and arrange free pickup of their vehicle at a time that works for them. Rock Connections will provide sales and customer service support to both online and offline customers.

52.    The founder and chairman of Rock Connections was Gilbert, the founder and chairman of Quicken Loans, majority owner of the NBA's Cleveland Cavaliers, and a high-profile Vroom investor since 2015. Vroom's press release noted that Gilbert had, at the time of the press release, recently invested in Vroom's 2017 $76 million Series F round of funding that had raised Vroom's total equity funding to $295 million since inception. The press release included quotes from Gilbert himself in which Gilbert asserted, among other things, that "[p]artnering with Vroom to help grow and support its exciting and unique model of purchasing cars online, with an experience that clearly feels much better than existing car purchasing methods, couldn't be a more perfect fit" for Rock Connections. Rock Connections was a wholly owned subsidiary of Rocket Companies, Inc.

53.    In April 2020, just two months before the IPO, Vroom entered into a new "Customer Experience Management Agreement" for Rock Connections to handle Vroom's Customer Experience function (the "2020 Customer Experience Agreement"). The terms of that agreement show that Vroom had much more than "limited control" over the customer service provided to Vroom customers by Rock Connections. Rather, the 2020 Customer Experience Agreement between Vroom and Rock Connections show, among other things, that (a) Rock

Connections provided all customer service in accordance with Vroom's policies and procedures; (b) that Rock Connections was required to "enter and save all required information" in extraordinarily granular detail in Vroom's CRM system, making it accessible to Vroom's senior executives and management; (c) Vroom had control over Rock Connections' staffing and training of staff; and (d) Vroom's senior executives and management had unfettered access to monitor the customer support being provided to potential Vroom customers, including but not limited to, monitoring capabilities for both voice and data with or without Rock Connections' knowledge, the allowance of onsite visits by Vroom personnel to Rock Connections' facility, the provision of weekly reports to Vroom, and a requirement for weekly meetings between representatives of Rock Connections and Vroom.

54.     Both Vroom and Rock Connections acknowledged that the purpose of the 2020 Customer Experience Agreement was "to maximize sales by Vroom of Vehicles, trade-ins of Vehicles by Customers, sales by Vroom of Value-Added Products, and Direct Buys of vehicles from Customers, while providing to Customers the highest quality customer service and support." Thus, under the terms of the 2020 Customer Experience Agreement, Rock Connections was tasked with providing a litany of "customer sales and support services," all of which were to be conducted in accordance with policies and procedures provided by Vroom. Specifically, in addition to operating Vroom's customer service call center, Rock Connections agreed to:

- Transfer calls to other operational teams at Vroom ***in accordance with Vroom's policies and procedures…***;

- Send emails to Customers who have consented to receiving email communications from Vroom or in response to Leads ***in accordance with Vroom's Policies and Procedures***;

- ***When and if implemented by Vroom pursuant to written instruction***, send text messages to Customers to facilitate completion of a Transaction or in response to Leads, provided that the Customer has consented to receiving text messages from Vroom and Rock sends such texts ***only in accordance with Vroom's Policies and Procedures***;

- ***When and if implemented by Vroom pursuant to written instruction***, provide support via online chat messages to Customers to facilitate completion of a Transaction or in response to Leads ***in accordance with Vroom's Policies and Procedures***;

- Assist Customers in selecting a Vehicle, understanding Vehicle features, obtaining credit pre-approval, completing a credit application, obtaining trade-in appraisals, ***understanding Vroom's limited warranty***, understanding Value-Added Products … and ***understanding Vroom's transaction terms***, in each case, as may be requested by the Customer;

- Assist Customers who wish to sell their Vehicle to Vroom and are not trading in such Vehicle in connection with a Vehicle purchase ("Direct Buy") in obtaining an appraisal from Vroom. Any such Direct Buy Services shall be conducted by the Client Communication Specialist ("CCS") team at Rock ***in accordance with Vroom Policies and Procedures***;

- For each Customer who chooses to purchase a Vehicle and has or obtains the requisite financing to do so, complete and email to such Customer a summary of the terms of the proposed transaction, including Vehicle price, financing terms, fees and taxes, Value-Added Products and trade-in value, in each case, as applicable ("Deal Summary") ***in a form mutually agreed by Vroom and Rock***;

- ***Enter and save all required information in Vroom's customer relationship management ("CRM") system in accordance with Vroom's Policies and Procedures***;

- Collect documentation from Customers that is needed to complete a Transaction, such as a driver's license, proof of insurance, and any requested loan stipulations;

- Ensure that the Deal Summary and documents collected from each Customer ***are saved appropriately in Vroom's CRM, change the stage of the Transaction in the CRM to "finalizing deal" for Quality Assurance Team review and, following such review, change the status***

21

*of the Transaction in the CRM to "Contracting" so it can be picked up by the Vroom documentation team (or such other designations as Vroom may determine and communicate to Rock pursuant to written instruction)*; and

- Provide such other assistance and guidance to Customers as may be reasonably necessary to assist them in a Transaction.

55.     Notably, as set forth above, the 2020 Customer Experience Agreement required that Rock Connections "enter and save all required information" in Vroom's CRM system, including the ability to save documents in the system, edit the stage of each transaction in the system, and change the status of each transaction in the system. As such, Vroom's CRM system, which it maintained during the Relevant Period, contained detailed information concerning each consumer transaction with Vroom and any related customer service issues that were related thereto.

56.     The information contained in Vroom's CRM system was incredibly granular, as evidenced by the fact that the 2020 Customer Experience Agreement also required that Rock Connections "record 100% of the audio calls made in connection with the Services and ensure that all email and other written communications between Rock and a Customer are tracked and saved in Vroom's CRM database."[3] The 2020 Customer Experience Agreement also mandated that Rock Connections "notify Vroom promptly in writing upon its receipt or knowledge of any complaint from any person, including a Customer, or entity regarding any Services provided [under the Agreement], and … provide reasonable assistance in researching, investigating and responding to

---

[3] Additionally, the 2020 Customer Experience Agreement mandated that Rock Connections "provide Vroom with theability to access the recording system remotely vis Secure Internet access (https), as well as search for, listen to, and download contacts."

such complaints."

57.     Thus, the Individual Defendants had access to Vroom's CRM system and all of the granular information it contained for each Vroom transaction and customer service interaction during the Relevant Period.

58.     The 2020 Customer Experience Agreement also evidenced Vroom's control over Rock Connections' provision of customer service in other ways, including with respect to staffing. For example, the 2020 Customer Experience Agreement provided that Rock Connections and Vroom would "create, mutually agree upon and maintain a staffing plan … to adjust staffing levels for [customer service] Agents from time to time as needed." As part of this staffing plan, Rock Connections and Vroom would both "review hiring levels and needs on a rolling three-month basis…and otherwise ensure adequate staffing of [customer service] Agents to provide the Services throughout the Term," with the parties also working together to develop a training program for these customer service agents. Vroom had the right to monitor this training program, and the scripts developed and used by the customer service agents were to be "mutually develop[ed]" by Vroom and Rock Connections, with Vroom being "responsible for the compliance of all Scripts with applicable law and regulation."

59.     Vroom also had virtually unfettered access to monitor Rock Connections' communications and the customer service being provided to Vroom's customers. In addition to storing the recordings of all calls between Rock Connections and Vroom customers in Vroom's CRM system, as set forth above, the 2020 Customer Experience Agreement provided that Rock Connections would "provide Vroom with monitoring capabilities for both voice and data concerning Calls" and that Vroom had "the right, as often as it desires, to monitor, without Rock's

knowledge, the calls being performed by Rock on behalf of Vroom." Vroom was also authorized under the 2020 Customer Experience Agreement to "log into Rock's Five9 system (or any replacement system)" which allowed Vroom "to view the current status of the team working on Vroom's account, run reports specific to the Services, or listen to recorded or real-time calls." Rock Connections further agreed to provide access to Vroom representatives to be on site at the Rock Connections facility from time to time.

60.     The 2020 Customer Experience Agreement also stated:

representatives of Rock and Vroom shall meet on a weekly basis, at times and locations to be agreed upon, to review reports and matters relevant to the transactions contemplated by this Agreement, including, without limitation, Rock's performance of the Services, sales by Vroom of Vehicles, trade-ins of Vehicles by Customers, sales by Vroom of Value-Added Products, the Staffing Plan, Cohort training and scripts.

61.     Lastly, Rock Connections was required to "transmit to Vroom weekly data and reports relating to the provision of the Services" under the 2020 Customer Experience Agreement "in a form to be mutually agreed by the Parties…."[4]

62.     In the months leading up to Vroom's June 2020 IPO, Vroom significantly reduced its used vehicle inventory in an effort to limit its exposure to an expected drop in demand as a result of the COVID-19 pandemic. As Defendant Hennessy would later explain:

[W]hen the COVID pandemic came to the United States, it was a very sobering time for us, as we have been in this game long enough to understand that aging

---

[4] In August 2020, Rock Connections assigned its responsibilities under the 2020 Customer Experience Agreement to Rocket Auto LLC ("Rocket Auto"), another wholly owned subsidiary of Rocket Companies, Inc., through an assignment again signed by Defendant Hennessy. The substance of the 2020 Customer Experience Agreement was unchanged, and Rocket Auto agreed to provide the services to Vroom under the same terms as expressed in the 2020 Customer Experience Agreement, which was attached as an exhibit to the assignment. Given the close relationship between Rock Connections and Rocket Auto as wholly owned subsidiaries of Rocket Companies, Inc., and given that the terms of the Agreement remained unchanged, in this complaint Rock Connections shall continue to be called the provider of services to Vroom under the 2020 Customer Experience Agreement despite this assignment.

inventory can be the death of a car retailer. And yet in the early days of COVID, we saw a significant contraction in retail demand, which had ripple effects into the wholesale markets. ***Given the severity of the contraction and the extreme lack of visibility, we made the difficult decision to dramatically reduce our exposure to these alarming trends***.

\*       \*       \*

…in late March and into the first half of the second quarter…[w]e not only stopped buying new inventory, we methodically, dynamically and carefully price[d] our inventory to move very quickly.

\*       \*       \*

At our peak in March, we were carrying over $200 million in inventory. At our low point in Q2, our inventory hit a low watermark of approximately $70 million….

42.     Vroom also reduced its employee headcount as Defendant Hennessy stated that since "[t]he wholesale markets underwent an alarming bout of instability and illiquidity, …we had to institute emergency furloughs and salary reductions." Specifically, Vroom disclosed that, "[e]ffective May 3, 2020, approximately one-third of [its] workforce was placed on furlough. The majority of employees furloughed were in reconditioning, logistics, acquisitions and TDA sales, which were the positions most affected by the reduction in unit volume."

63.     However, fears concerning an initial drop in used vehicle sales at the beginning of the pandemic disappeared quickly in the beginning of summer of 2020, when the market for used car sales began to boom due to a mix of factors, including dealer shortages of new vehicles and consumers wanting ownership of a car over riding mass transit or use of a ride-share company.

64.     The consumer demand for used vehicles beginning in May 2020 was a ripe environment for Vroom's IPO, and the analyst community agreed with this sentiment.

**T**HE **IPO O**FFERING **M**ATERIALS

65.     In the IPO Offering Materials, the Company was portrayed as extraordinarily well-positioned to capitalize on the booming market for used car sales and the consumer shift in favor of ecommerce because its Growth Flywheel would generate sales growth and its asset-light business approach would simultaneously reduce risk.

66.     To that end, the IPO Offering Materials represented that Vroom had been "strategically" building inventory for over a month that would "convert at target margins" and allow the Company to "ultimately exceed pre- COVID-19 levels":

> On April 20, 2020, we began to acquire new inventory, with a primary focus on high-demand models that we believe will convert at target margins. We intend to strategically build our inventory levels in the near term to return to and ultimately exceed pre-COVID-19 levels.

67.     The IPO Offering Materials noted that this increase in inventory was the first step in Vroom's generation of increased sales growth through the use of Vroom's Growth Flywheel, shown below:



68.     Vroom touted its purportedly robust growth trajectory as being due to the various

points on its Growth Flywheel. As explained in the IPO Offering Materials:

> Our business has grown significantly as we have scaled our operations. Our growth
> is not attributable to a single innovation or breakthrough, but to coalescence around
> multiple strategies that serve as points on our flywheel. The diversity and number
> of vehicles in our inventory drive demand and support expanded national marketing
> to enable us to acquire new customers more cost effectively, allowing us to invest
> back into our platform to continue to improve the customer experience, all of which
> drives increased conversion. This flywheel revolves, builds momentum and
> ultimately propels our business forward as we seek to drive disciplined growth and
> operating leverage.

69.     As Vroom further stated, "[s]ales conversion drives revenue growth and is an

output of the acceleration of every point on the growth flywheel."

70.     With respect to the Customer Experience spoke on its Growth Flywheel, Vroom

told investors that Customer Experience was "fundamental to the growth of [its] business" and

that the Company offered "[e]xceptional customer support," an "exceptional customer

experience," and an "exceptional ecommerce experience." This, it contended, was a primary

consideration differentiating its offerings from those of "traditional auto dealers and the peer-to-

peer market," representing that "*[o]ur professional customer experience team accompanies the

buyer through every step of the process to make sure all questions are answered and any

concerns are addressed*" and that "*[i]n all of our customer interactions, our goal is to ensure

that every customer is a delighted customer.*" Similarly, Vroom stated that "*[o]ur on-demand

shopping and contact-free, convenient delivery* not only saves our customers a trip to the

dealership, *it provides the ultimate driveway experience.*"

71.     The IPO Offering Materials further assured investors:

> [A]t any point in the buying or selling process, our customers may encounter
> questions or challenges they are not equipped to or comfortable with resolving

online. Our customer experience team provides human support to our customers in these situations. Our customer experience team handles customer questions about vehicle selection, financing, and the purchase or sale process. The team has been trained on our sale process and our core values of transparency and high customer satisfaction.

72.     The IPO Offering Materials also contained the following chart illustrating Vroom's robust "Ecommerce Revenue" growth purportedly attributable to the Company's Growth Flywheel and the "[e]xceptional" Customer Experience it offered:



73.     With its "[e]xceptional" Customer Experience leading to increased conversion, sales growth and ecommerce revenue on the Company's Growth Flywheel, Vroom told investors that it was simultaneously reducing risk through its "asset-light" business model whereby it outsourced portions of its critical business functions, such as its Customer Experience function through the 2020 Customer Experience Agreement.

74.     Vroom told investors in the IPO Offering Materials that its asset-light strategy was "fundamental to [its] business model," that it provided "flexibility, agility and speed…without taking on…unnecessary risk and capital investment" while also driving "improved unit economics and operating leverage," and that, given what it represented to be the benefits of this approach, **"this asset-light strategy was one of Vroom's "Competitive Strengths."** With respect to the

outsourcing of Vroom's Customer Experience team, the IPO Offering Materials represented that Vroom had **"*partnered with a leading customer experience management provider to operate our primary call center,*"** which enabled the Company to "centralize [its] contact center services, ensure consistency in customer interactions, increase conversion and maximize operating efficiencies."

75. The IPO Offering Materials included as an exhibit the 2020 Customer Experience Agreement between Vroom and Rock Connections that was signed by Defendant Hennessy. *Vroom did not disclose any then-occurring adverse issues or trends related to either (1) its Customer Experience function or (2) its outsourcing of that function pursuant to the 2020 Customer Experience Agreement in the IPO Offering Materials*. In fact, in its enumerated risk factors, the Individual Defendants sought to portray any negative complaints about the Company as "misinformation" that needed to be "correct[ed]" or "mitigate[d]" and that could theoretically only harm Vroom's business *in the future*:

> Complaints or negative publicity about our business practices, marketing and advertising campaigns, vehicle quality, compliance with applicable laws and regulations, data privacy and security or other aspects of our business, especially on blogs and social media websites, could diminish consumer confidence in our platform and adversely affect our brand, ***irrespective of their validity***. The growing use of social media increases the speed with which information and opinions can be shared and thus the speed with which our reputation can be damaged. ***If we fail to correct or mitigate misinformation or negative information about us, our platform, our vehicle inventory, our customer experience, our brand or any aspect of our business, including information spread through social media or traditional media channels, it could materially and adversely affect our business, financial condition and results of operations***.

### THE SEPTEMBER 2020 SPO

76. After Vroom's IPO, the Individual Defendants continued to represent to investors that Vroom was supremely positioned to capitalize on a booming market for online used car sales.

For example, on June 10, 2020 (with less than three weeks left in Vroom's second fiscal quarter), Defendant Hennessy conducted an interview with investor news site *TheStreet* in which he claimed that Vroom was experiencing a surge in customer demand that created an "opportunity" to take Vroom public earlier than previously anticipated. Defendant Hennessy stated that the online used car market had "stabilized" and customers were now "twice as likely" to consider purchasing a used vehicle online compared to three months previously, ***"so we really see the markets coming our way."***

77.     On June 11, 2020, Defendant Hennessy conducted another interview with investor news site *TheStreet* in which he highlighted the purportedly massive market opportunity for Vroom's products. Hennessy represented that a shift to individual car ownership had been a "positive tailwind" for Vroom's business. He further claimed that with the ***"growth that we've had and now the continued tailwinds that we're seeing in our business, … all I can say is that Vroom is in excellent position to…enter…the public markets…."*** Hennessy also sought to downplay any concerns surrounding potential lingering adverse effects of the pandemic on Vroom's business, representing that the Company's recent employee furloughs were ***"just about in our rearview window, and now we're back to work and scaling the business."***

78.     The Individual Defendants also used Vroom's 2020 second quarter earnings release and conference call with analysts and investors to tout Vroom's market position and the Company's purported ability to capitalize on increasing demand for online used car sales. Specifically, in Vroom's August 12, 2020 press release announcing its financial results for the second quarter of 2020 (the "2Q20 Release"), Defendant Hennessy misleadingly represented that it was lower inventory levels, rather than any issue with Vroom's Customer Experience function,

that kept the Company from fulfilling increased consumer demand, and that Vroom's increasing inventory levels would solve that problem. Specifically, Defendant Hennessy stated:

> I am pleased with our results for the second quarter, in which we performed substantially ahead of our growth plan, and I am encouraged by both the continued validation of the Vroom model and the performance of our employees in a tough environment. During the course of this single quarter, we managed through significant swings in demand and numerous operational challenges brought on by the COVID-19 pandemic. In response to the drop in demand and uncertainty around vehicle pricing early in the pandemic, we chose to de-risk the business by significantly reducing our inventory during the first half of the quarter. As demand increased and pricing became more stable through the second half of the quarter, we pivoted to start rebuilding inventory and continue to do so. These lower inventory levels prevented us from fulfilling all of the demand that materialized in the second half of the quarter. We believe we continue to be well positioned to navigate the challenges presented by the COVID-19 crisis and take advantage of shifting consumer buying and selling patterns in favor of ecommerce.

79.     The same day, on Vroom's earnings call with analysts and investors to discuss Vroom's second quarter 2020 results, Defendants Hennessy and Jones continued to represent to the market that more inventory, or capacity, for Vroom would lead directly to more sales, and that any capacity restraints as a result of Vroom's earlier sell-down of inventory in response to the pandemic had been resolved moving into the Company's third quarter. Specifically, Defendant Hennessy stated that "[c]ontent begets [sales] conversion," and that Vroom was in the midst of a "V-shaped recovery" where, after selling down its inventory in April 2020, the Company "[s]pent every day since May trying to build back [its] inventory" and had experienced "strong monthly sequential increases in unit sales in June and July." Defendant Jones similarly stated that "despite lower average selling prices, we believe we will have ascending e-commerce gross profit per unit in the low to mid-single digits." And later, in response to an analyst question, Hennessy stated:

> *[W]e've got capacity. . . lined up not only in Q3 to match our guidance*, but now and then I'd call a catch-up period that allows us to continue on our scaled ramp in conjunction with our long-range plan. *So we believe that we're almost out of this*

*capacity constraint issue in this quarter.*

80.     Defendant Jones similarly responded to an analyst question: "[Y]ou had mentioned bottleneck [for vehicle reconditioning]. I think we're not currently experiencing any significant capacity constraints in any of those."

81.     The Individual Defendants' representations to the market that any capacity bottleneck limiting Vroom's inventory originating from the early days of the pandemic had been resolved, and no other impediment would stop Vroom from maximizing its ability to generate increased conversion on the Company's Growth Flywheel, had its intended effect as Vroom's stock price skyrocketed in the wake of these disclosures. Vroom's stock climbed from its IPO price of $22.00 per share on June 9, 2020, to close at a high of $73.87 on September 1, 2020, *a staggering 235% price increase in less than three months.*

82.     The conditions were ripe for the Individual Defendants to take advantage of Vroom's high stock price. Only one week later, on September 8, 2020, the Individual Defendants, seeking to capitalize on Vroom's soaring stock price, formally announced the September 2020 SPO and filed the SPO Registration Statement with the SEC. J.P.Morgan noted in a September 9, 2020 analyst report that the Individual Defendants acknowledged the September 2020 SPO was "opportunistic," stating: "[Vroom] [m]anagement noted that the equity raise was opportunistic given the outperformance in [Vroom] shares since the IPO…." Three days later, Vroom filed the SPO Prospectus with the SEC. The SPO Offering Materials, signed by Defendants Hennessy, Jones, Mylod, Dahnke, Farello, Lang, and O'Shaughnessy, repeated many of the same misrepresentations made by Vroom in the IPO Offering Materials concerning the use of its Growth Flywheel to generate sales growth and its asset-light business approach to simultaneously reduce

risk.

83.     For instance, in the SPO Offering Materials, the Individual Defendants again touted the Company's growth attributable to its Growth Flywheel as well as its "[e]xceptional customer support," "exceptional customer experience," and "exceptional ecommerce experience" that Vroom claimed to provide. And, as in the IPO Offering Materials, Vroom represented that its "professional customer experience team accompanies the buyer through every step of the process to make sure all questions are answered and any concerns are addressed" and that "[i]n all of our customer interactions, our goal is to ensure that every customer is a delighted customer." Similarly, Vroom once again stated that "[o]ur on-demand shopping and contact-free, convenient delivery not only saves our customers a trip to the dealership, it provides the ultimate driveway experience."

84.     In the SPO Offering Materials, Vroom also again told investors that it was simultaneously reducing risk through its "asset-light" business model wherein it outsourced portions of critical business functions, such as its Customer Experience function through its 2020 Customer Experience Agreement. Vroom once again characterized its asset-light strategy as "fundamental to [its] business model" and as one of Vroom's "Competitive Strengths." With respect to the outsourcing of Vroom's Customer Experience team, the SPO Offering Materials again represented that Vroom had "partnered with a leading customer experience management provider to operate our primary call center," which enabled the Company to "centralize [its] contact center services, ensure consistency in customer interactions, increase conversion and maximize operating efficiencies."

85.     Additionally, ***the SPO Offering Materials specifically referenced the BBB in the context of a purported risk disclosure about the possible impact of consumer complaints on the***

*Company's business*. Vroom, however, ***did not disclose that its BBB accreditation had been revoked or any then-occurring adverse issues or trends related to either (1) its Customer Experience function or (2) its outsourcing of that function pursuant to the 2020 Customer Experience Agreement in the SPO Offering Materials***. Rather, the Individual Defendants once again sought to portray any negative complaints about the Company as "misinformation" that needed to be "correct[ed]" or "mitigate[d]" and that could theoretically only harm Vroom's business ***in the future***:

> Complaints or negative publicity about our business practices, marketing and advertising campaigns, vehicle quality, customer service, delivery experience, compliance with applicable laws and regulations, data privacy and security or other aspects of our business, ***including on consumer platforms such as the Better Business Bureau***, consumer facing blogs and social media websites, could diminish consumer confidence in our platform and adversely affect our brand, ***irrespective of their validity***. The growing use of social media increases the speed with which information and opinions can be shared and thus the speed with which our reputation can be damaged. ***If we fail to correct or mitigate misinformation or negative information about us, our platform, our vehicle inventory, our customer experience, our brand or any aspect of our business, including information spread through social media or traditional media channels, it could materially and adversely affect our business, financial condition and results of operations***.

86.     On September 8, 2020, the same day the SPO Registration Statement was filed, Vroom filed with the SEC a current report on Form 8-K providing an update on Vroom's operational and financial results intended to spur purchases of shares in the September 2020 SPO closing only a few days later (the "September 8, 2020 Form 8-K"). In the September 8, 2020 Form 8-K, the Individual Defendants told Vroom investors, only three weeks from the close of its third quarter, that the Company's post-pandemic build-up of inventory was translating to continued growth in ecommerce units sold, portraying the Company's Growth Flywheel as producing higher sales conversion than ever, and as such that Vroom was making substantial positive adjustments

to the third quarter 2020 guidance it had issued only a month earlier. Specifically, the September 8, 2020 Form 8-K stated:

> Our inventory strategy is designed to take advantage of what we believe are structural shifts in consumer behavior and increased demand for the Vroom model,and ***we have continued to scale our inventory levels in the third quarter of 2020***. ***As higher inventory levels lead to higher conversion, we have experiencedcontinued growth in ecommerce units sold***. As well, ***the increase in demand combined with continuing supply constraints in the broader market has led to better than expected improvements in our gross profit per unit***. ***As of the date of this report, we have seen our results continue to improve after the disruptions inthe early stages of the COVID-19 pandemic. Accordingly, we are updating the guidance we provided with our second quarter earnings release for Q3 2020 as follows***:
>
> - Ecommerce unit sales of 8,700 – 8,900 (from 8,500 – 8,800), average totalrevenue per unit of $24,500 (from $23,500) and average gross profit per unit of $1,850 – $1,950 (from $1,600 – $1,700).
>
> *     *     *
>
> - Total revenue of $290 million – $310 million (from $268 million – $290 million).
>
> - Total gross profit of $21 million – $23 million (from $16 million – $18 million).
>
> - Net loss per share of $(0.40) – $(0.36) (from $(0.42) – $(0.37)).

87.     Given the Individual Defendants' representations, it was no surprise that the September 2020 SPO was a success. Vroom sold 10.8 million shares of its common stock at $54.50 per share for nearly $590 million in gross offering proceeds in the September 2020 SPO.

## IN REALITY VROOM HAD A BROKEN CUSTOMER EXPERIENCE SPOKE ON ITS GROWTH FLYWHEEL

88.     In reality, Vroom's touted Customer Experience spoke on its Growth Flywheel was a failure and had been leading up to the Company's IPO. In fact, Vroom's Customer Experience had been in a downward spiral beginning as early as January 2020, over five months before the

Company's IPO and over eight months before the September 2020 SPO.

89.    For instance, BBB's board of directors had revoked Vroom's accreditation due to consumer complaints.[5] Among other things, BBB stated that, "[b]eginning in January 2020, [it] began receiving complaints and customer reviews [about Vroom] which exhibited several different patterns," including complaints from Vroom customers asserting that: (a) "the vehicle[] they purchased from photos was not the vehicle they received"; (b) "[w]hen the vehicle was received it had either body damage, interior was dirty, discolored or damaged or all of the above"; (c) damaged "cars were delivered at night, so damages were not noticed at delivery"; and (d) "cars were left in a parking lot or driveway at night with the keys left in them." Further, "[c]onsumers also stated they were having customer service and communication issues when trying to reach out to the company to address their concerns" and "were not receiving the necessary paperwork to get their car registered," were experiencing "delayed delivery in receiving their car," and/or were experiencing "issues concerning their trade-in."

90.    The BBB further found that, "[s]ince January [2020], the pattern of [Vroom] complaints has not trended down but has actually increased," with "new patterns of complaints" and complaints have continued into 2021.

91.    Based on the overwhelming multitude and type of customer service issues being reported to the BBB, the BBB initiated proceedings to revoke Vroom's BBB accreditation. The BBB notified Vroom that its accreditation was suspended and was undergoing review for possible revocation.

92.    Despite this trend of increasing consumer complaints about Vroom's Customer

---

5. *See* http://www.bbb.org/us/tx/stafford/profile/used-car-dealers/vroom-0915-90044633

Experience, Vroom did not disclose in the IPO Offering Materials or the SPO Offering Materials any then-occurring adverse issues or trends related to either its Customer Experience function or its outsourcing of that function pursuant to the 2020 Customer Experience Agreement. Nor did Vroom disclose the revocation of its BBB accreditation in the SPO Offering Materials. Further, during the Relevant Period as Vroom increased its inventory, the Individual Defendants misrepresented and/or failed to disclose that: (a) Vroom's inventory growth had far outpaced the capabilities of its existing sales and support personnel, creating a logistical bottleneck that threatened the Company's profits, the value of its existing inventory and its ability to achieve positive cash flows; (b) Vroom's lack of adequate sales and support staff had resulted in a degraded Customer Experience and lost sales opportunities; (c) as a result of (a) and (b) above, Vroom needed to invest tens of millions of dollars in bolstering its sales and support and logistics networks, materially impairing the Company's short- term profitability; and (d) as a result of (a)-(c) above, Vroom was poised to suffer accelerating losses and increased negative cash flows, despite a robust online used car market.

93.     At the time of the filing of this complaint, Vroom's BBB report states that the Company remains unaccredited by the BBB more than a year after its accreditation was revoked and the BBB also lists Vroom as having an "F" rating, the lowest rating given by the BBB.[6]

94.     Media outlets have also now reported on Vroom's disastrous Customer Experience issues, including *NBC* affiliate *KPRC 2* in Houston, Texas, where Vroom holds a significant presence. On September 13, 2021, *KPRC 2* published a report titled "KRPC 2 Investigates online car buying nightmares", (the KPRC 2 Report") focusing on Vroom complaints and corroborating

---

[6] https://www.bbb.org/us/tx/stafford/profile/used-car-dealers/vroom-0915-90044633

the problems noted by the BBB. For example, in the KPRC 2 Report, one Vroom customer stated

that, over six months after she purchased a car from Vroom in February 2021, she was still unable

to drive the car she purchased because "a lack of paperwork" inhibited her from "register[ing] the

car or get[ting] insurance." That customer also said that when she contacted Vroom to try to get a

resolution of her issues, Vroom's customer service representatives laughed at her.

95.     "Other common complaints" referenced in the KPRC 2 Report are similar to those

discussed by the BBB, and "include vehicles misrepresented in photos, customers not receiving

necessary paperwork to get their car registered, delayed deliveries, and communication problems

- like sending customers in circles."

96.     Complaints about Vroom were not just limited to the KPRC 2 Report. On February

22, 2021, automotive news provider *Torque News* published an article, with embedded videos,

titled "Used Car Purchased Online From Vroom Goes Horribly Wrong," detailing one consumer's

failed attempt to purchase a $63,000 BMW i8 from Vroom. Ultimately, the consumer was unable

to consummate the transaction with Vroom because Vroom misplaced the cashier's check that the

consumer sent to pay for the car. The article and videos included therein additionally detail the

deficient customer service provided by Vroom once the Company had misplaced the consumer's

cashier's check, and the severe difficulties faced by the consumer in interacting with Vroom's

Customer Experience team to resolve these issues. Lastly, the article also referenced the revocation

of the BBB accreditation.

**VROOM'S FAILURES WITH CUSTOMER
EXPERIENCE IMPACT VROOM'S FINANCIAL STATEMENTS**

97.     Vroom stated in its SEC Form 10-K for the year-ended December 31, 2020, filed

with the SEC on March 3, 2021, and signed by Defendants Hennessy, Jones, Mylod, Dahnke,

Farello, Lang, and O'Shaughnessy, (the "2020 Form 10-K"), that it "recognizes revenue upon transfer of control of goods or services to customers, in an amount that reflects the consideration to which the Company expects to be entitled in exchange for those goods or services." Specifically, with respect to its retail vehicle revenue (vehicles sold to customers through its ecommerce platform and TDA retail location), Vroom contends that it "satisfies its performance obligation and recognizes revenue for used vehicle sales generally at a point in time when the vehicles are delivered to the customer for ecommerce sales or picked up by the customer for TDA sales." As such, Vroom is unable to recognize revenue from sales where consumers do not receive the car they purchased or are experiencing "delayed delivery in receiving their car," and could also be unable to recognize revenue where consumers are experiencing "issues concerning their trade-in," which are all issues identified by the BBB as subjects of increased complaints beginning in January 2020.

98.    While Vroom didn't disclose its failure to consummate transactions and deliver cars to consumers throughout 2020 and its need to process returns for damaged and otherwise defective cars during the same period directly impacted Vroom's bottom line, as explained above, another area of its disastrous Customer Experience was exacerbating these issues. Specifically, when consumers contacted Vroom to attempt to rectify issues with their purchase, they fell into a black hole of customer service, with the BBB finding that consumers were "having customer service and communication issues when trying to reach out to the company to address their concerns" and were "switched around to different [customer service] departments" without "receiving any assistance." As such, even if consumers were willing to attempt to rectify problems with their purchase from Vroom, Vroom's Customer Experience team was often unable to respond

in any meaningful way to these overtures, thus impacting Vroom's bottom line.

99.     Finally, because Customer Experience issues at Vroom were leading to a degraded Customer Experience and missed sales opportunities, Vroom began to experience a bloated, aging surplus of used cars in inventory, as evidenced in the Company's 2020 Form 10-K. Specifically, Vroom's inventory line item on its balance sheet increased nearly 106% from year-end 2019 to year-end 2020 (from $205.746 million to $423.647 million). While Vroom told investors that it intended to strategically build inventory levels to return to and ultimately exceed pre-COVID-19 levels, this bloated, aging surplus inventory forced Vroom to liquidate used vehicles at fire sale prices rather than converting "at target margins" as previously stated. As such, contrary to the Individual Defendants' representations that "higher inventory levels lead to higher conversion" Vroom's broken Customer Experience spoke had resulted in a massive undisclosed roadblock to sales conversion on the Company's Growth Flywheel and had a material negative impact on the Company's revenue, margins, and earnings.

**THE TRUTH BEGINS TO EMERGE**

100.    On November 11, 2020, the Individual Defendants caused the Company to issue a press release (the "November 11, 2020 Press Release"), which was filed with the SEC on Form 8-K the next day. The November 11, 2020 Press Release announced the Company's third quarter 2020 financial results for the period ended September 30, 2020, and gave guidance for the fourth quarter of 2020. Nevertheless, the Company claimed it was on track to achieve the following financial results for the fourth quarter:

- Ecommerce unit sales of 10,500 to 11,500, implying 25% sequential growth and Q4 year over year growth of 74% at the middle of the guidance range.

- Average ecommerce selling price per unit of $24,500 to $25,500 and average ecommerce gross profit per unit of $2,050 to $2,150.

- TDA unit sales of 1,400 to 1,600, average selling price per unit of $24,500to $25,500 and average gross profit per unit of $1,650 to $1,750.

- Wholesale unit sales of 6,000 to 7,000, average selling price per unit of $9,500 to $10,500 and average gross profit per unit of breakeven to $100.

- Total revenue of $372 to $414 million.

- Total gross profit of $24 to $28 million.

- EBITDA of ($52) to ($44) million.

- Stock-based compensation expense of $4.3 million.

- Net loss per share of ($0.41) to ($0.35).

101.    The November 11, 2020 Press Release quoted Defendant Hennessy highlighting the purported strength of Vroom's business model:

> I am very pleased with our results for the third quarter, in which we successfully managed the challenges presented by the COVID-19 pandemic, outperformed our plan, demonstrated the strength of our business model, and hit the accelerator on significantly scaling our business. ***By doing the things we said we would do -- adding vehicle inventory, increasing marketing, relying on data to drivedecision making, and enhancing our customer experience -- we increased the velocity of the Vroom flywheel, drove conversion and increased GPPU. We will continue to execute our plan and invest in the growth of our business as we transform the market for buying and selling used vehicles.***

102.    That same day, during after-market hours, the Company held an earnings call attended by Defendants Jones and Hennessy. During the call, Hennessy revealed that the Company was suffering from a "bottleneck" in sales support, or constrained growth, and needed to invest heavily into building up the Company's sales support and logistics networks.

103.    Defendant Hennessy also spoke about Vroom's increased inventory and how the

Company successfully increased gross profits while taking advantage of increased customer demand:

> As we look at what drove our significant growth in units and gross profit, first and foremost, we see that our teams across the company executed against our playbook extremely well. We leveraged our advanced data science to grow our listed inventory to over 12,000 units at the end of the quarter, a record high even compared to prepandemic levels, offering our customers outstanding selection and great prices. Vroom was able to generate a significant increase in e-commerce gross profit per unit to $2,188, up 39% year-over-year and 104% over the second quarter. We have seen demand during the pandemic shift towards lower-priced vehicles, and we have responded to that demand. In doing so, we have demonstrated that we can deliver very strong unit economics over average selling prices in the mid-$20,000 range. This supports our long-range thesis that as we offer lower-priced vehicles, we'll be expanding our demand and conversion, while at the same time, expanding our unit economics.
>
> *              *              *
>
> The demand for Vroom model broadly and the demand for our products and services, specifically, remains very strong. There are a number of contributing factors. First, we continue to experience what we believe are structural changes in demand for our e-commerce and delivery model. ***Second, increased inventory drives increased demand and increased conversion, which spins our growth flywheel, as demonstrated by our performance in unit sales growth and improving unit economics.*** Finally, we've begun to see the early results of our new brand campaign. We launched new spots that showcase Vroom's better way to buy and better way to sell a used vehicle.

104.    During the call, Defendant Hennessey continued to assert that Vroom was on track to meet its guidance and that the Company was positioned to take advantage of increased demand. During an exchange with analyst Ronald Victor Josey from JMP Securities LLC, Defendant Hennessey stated as follows:

**Ronald Victor Josey:**

Paul [Hennessy], I wanted to ask a little more about supply based on what we're just talking about. And I know -- I think you just said you don't believe Vroom is supply constrained. So maybe can you talk a little bit more about how Vroom is positioned for the all-important first half of the year as we go into 2021 for supply

as demand still remains sort of elevated for used cars? And as you talk about that, any insights on just the overall demand from an October perspective? Did that continue from what you saw for September? Any insights on intra-quarter would be helpful as well.

**Hennessy:**

Sure. Supply, as I said, Ron, I think we're feeling in good shape. We're positioned ourselves to be selective because we've got great consumer demand to sell us their vehicles as well as auction market. Wholesale markets have come down, and we see great opportunity to buy cars there. So again, given our size, given our projected sales and our growth rate, we feel like we're in a great position going forward.

As far as how are we doing intra-quarter, I guess what I'd say is I stand by our guidance. We just put guidance out there to give you really good insight based on everything that we're seeing thus far. And I think feel great about the numbers that Dave talked about in terms of e-commerce growth on a year- over-year basis. It's just -- it's strong. So we're feeling really good.

105.    During the same call, Defendant Jones claimed that Vroom was efficiently converting demand through a focus on the Company's sales platform:

Thanks, Paul [Hennessy]. Good afternoon, everyone. Let me unpack the quarter a bit. E-commerce units sold in the third quarter increased 59% year-over-year, which was a new quarterly record for Vroom, driven by increased inventory and quality demand generation. As Paul mentioned, the e-commerce units were up 31% sequentially, again, due to an increased inventory offering. Listed vehicles increased to about 12,300 at the end of Q3, from 5,700 at the end of Q2 and are currently over 13,000. Of the 13-plus thousand vehicles listed today, excluding pending vehicle sales, approximately 72% are available for sale and the remainder are coming soon inventory. We are estimating 10,500 to 11,500 e-commerce units sold for Q4. The midrange of our guidance would imply 25% sequential growth quarter-to-quarter and accelerating 74% year-over-year growth compared to the 59% we experienced in Q3.

Our formula is simple: Provide a data-driven selection of inventory, world-class marketing to create demand, and then we convert that demand. ***We currently have ample reconditioning capacity, we can create plentiful demand, as Paul [Hennessy] mentioned, and we are currently expanding our sales platform to efficiently convert that demand.*** That's our focus in Q4. Through the third quarter, our year-to-date e-commerce units sold has grown 86% year-over-year. ***And with our strong sequential growth quarter-to-quarter, we are on track for continued strong growth in 2021.***

106.    On November 12, 2020, the Individual Defendants caused the Company to file Form 10-Q for the period ended September 30, 2020 (the "3Q 2020 10-Q"). The 3Q 2020 10-Q contained the financial information from the November 11, 2020 Press Release and was signed by Defendants Hennessy and Jones. Defendants Hennessy and Jones signed S a r b a n e s - O x l e y   A c t   o f   2 0 0 2   ( " SOX") certifications representing, among other things, that the 3Q 2020 10-Q "fairly presents, in all material respects, the financial condition and results of operations of the Company."

107.    The 3Q 2020 10-Q restated materially false and misleading statements from the SPO Registration Statement. The 3Q 2020 10-Q reiterated that Vroom maintained "scalable and vertically integrated operations" and utilized data science to "drive optimization and operating leverage across our ecommerce and vehicle operations" and to "enhance the customer experience…and optimize our overall inventory sales velocity." The 3Q 2020 10-Q continued to tout that "[f]rom the launch of our combined operations in January 2016, our business has grown significantly as we have scaled our operations[.]"

108.    On this news, the Company's stock price decreased to $35.49 on November 12, 2020, a 13% decrease from the previous trading day's closing price of $40.80. Although some of the Company's deficiencies had been disclosed at this time, the stock continued to trade at artificially inflated prices because the Individual Defendants continued to make material misstatements regarding adverse events and uncertainties that were negatively impacting Vroom's business.

109.    Then on March 3, 2021, the Company filed a press release on Form 8-K (the "March 3,2021 Form 8-K"), which announced the financial results for the fourth quarter and

fiscal year ended December 31, 2020. The March 3, 2021 Form 8-K announced the following disappointing results: a net loss of $60.7 million, an Adjusted EBITDA loss of $55.9 million, a net loss per share of $0.46, just $1,821 in total gross profit per ecommerce unit, and only $878 in gross profit per vehicle for the fourth quarter. The adjusted EBITDA loss was $3.9 million more than the range the November 11, 2020 Press Release gave.

110.   That same day, during after-market hours, the Company held an earnings call attended by Defendants Jones and Hennessy. During the call, Defendant Hennessy revealed that Vroom was suffering from severe sales backlogs because of inadequate sales and support staff, which had materially impaired the Company's ability to sell existing inventory. He stated, in relevant part:

> Sales and sales support operations are in a significantly better place than they were at the end of Q3 2020. We've nearly tripled the amount of staffing in both our sales organizations and our sales support organizations, and they continue to be an area of investment in the first quarter. It is important to note that as we experienced exceptional growth in the second half of 2020, ***backlogs in our business formed as there was more volume to process than our capacity could deliver. The result meant that our customers had to wait. When customers have to wait for us to complete a transaction or deliver a car, pick up a car, complete financial arrangements or register their vehicle, their experience is degraded.***
>
> As I mentioned, we've been invested in and will continue to invest in our sales and sales support organizations so that we remove any bottlenecks in our business as the business is scaling. ***We believe we are tracking against this objective and are confident in our ability to eliminate the backlogs and deliver an exceptional customer experience.*** I also want to make the point that our backlogs also contributed to a negative outcome on our retail and wholesale unit economics.
>
> *          *          *
>
> Said another way, we bought more inventory than we could actually process and that excess inventory needed to be moved in Q4 and will continue to be moved in Q1. We are confident that as our throughput increases as a result of our investments and as we turn our inventory faster, both our unit economics and our customer experience improve.

111.    On this news, the Company's stock sank to $31.61 per share on March 4, 2021, a 28% decrease from the previous trading day's closing price of $43.90. From when the truth began to emerge on August 12, 2020, until it was fully revealed on March 3, 2021, the Company's stock price sank from August 12, 2020's closing price of $69.01 to March 4, 2021's closing price of $31.61, a 54% decrease.

## DAMAGES TO VROOM

112.    As a result of the Individual Defendants' improprieties, Vroom disseminated improper, public statements concerning Vroom's operations, prospects and internal controls. This misconduct has devastated Vroom's credibility.

113.    As a direct and proximate result of the Individual Defendants' actions, Vroom has expended, and will continue to expend, significant sums of money defending and paying any settlement in the Securities Class Action.

114.    As a direct and proximate result of the Individual Defendants' actions as alleged above, Vroom's market capitalization has been substantially damaged, losing millions of dollars in value as a result of the conduct described herein.

115.    Lastly, the actions of the Individual Defendants have irreparably damaged Vroom's corporate image and goodwill. For at least the foreseeable future, Vroom will suffer from what is known as the "liar's discount", a term applied to the stocks of companies that have been implicated in illegal behavior and have misled the investing public, such that Vroom's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

116.    Plaintiff incorporates by reference and realleges each and every allegation set forth

above, as though fully set forth herein.

117.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

118.     Plaintiff is an owner of Vroom common stock and was an owner of Vroom common stock at all times relevant hereto.

119.     Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

120.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Vroom Board to institute this action against the Individual Defendants. Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

121.     At the time of filing this action, the Board consists of Defendants Hennessy, Mylod, Dahnke, Farello, Lang, and O'Shaughnessy (collectively, the "Director Defendants"), along with non-defendants Paula B. Pretlow and Frederick O'Terrell. Plaintiff needs only to allege demand futility as to half of the eight directors who are on the Board at the time this action is commenced.

**DEMAND IS FUTILE AS TO DEFENDANTS HENNESSY, MYLOD, DAHNKE, FARELLO, LANG, AND O'SHAUGHNESSY BECAUSE THEY EACH FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

122.     Defendants Hennessy, Mylod, Dahnke, Farello, Lang, and O'Shaughnessy all face a substantial likelihood of liability for their individual misconduct. Defendants Hennessy, Mylod, Dahnke, Farello, Lang, and O'Shaughnessy were directors during the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning

its business, operations, prospects, internal controls, and financial statements were accurate.

123.    Moreover, Defendants Hennessy, Mylod, Dahnke, Farello, Lang, and O'Shaughnessy, as directors owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company was acting legally and its internal controls were sufficiently robust and effective (and were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, they reviewed, authorized and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

124.    Defendants Hennessy, Mylod, Dahnke, Farello, Lang, and O'Shaughnessy knowingly and consciously allowing the authorization of false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of the fiduciary duties of loyalty and good faith, for which the Defendants Hennessy, Mylod, Dahnke, Farello, Lang, and O'Shaughnessy face a substantial likelihood of liability. If Defendants Hennessy, Mylod, Dahnke, Farello, Lang, and O'Shaughnessy were to bring a suit on behalf of Vroom to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. This is something they will not do. For this reason, demand is futile as to Defendants Hennessy, Mylod, Dahnke, Farello, Lang, and O'Shaughnessy.

**DEFENDANT HENNESSY IS NOT DISINTERESTED**

125.     As Vroom admits in its SEC filings, including the Company's annual proxy statement filed with the SEC on April 29, 2021 ("2021 Proxy"), Defendant Hennessey, the Company's CEO, is not an independent director. Defendant Hennessey is not disinterested for purposes of demand futility because his principal occupation is CEO of Vroom. For compensation in this position, for the fiscal year ended December 31, 2020, he received $4,315,077 in total compensation from the Company. This amount is material to Defendant Hennessey.

**DEMAND IS FUTILE AS TO DEFENDANTS HENNESSEY MYLOD,  DAHNKE, FARELLO, LANG, AND O'SHAUGHNESSY BECAUSE THEY ARE DEFENDANTS IN THE SECURITIES CLASS ACTION**

126.     Defendants Hennessey, Mylod, Dahnke, Farello, Lang, and O'Shaughnessy are incapable of considering a demand to commence and vigorously prosecute this action because they face additional substantial likelihood of liability as they are named defendants in the Securities Class Action.

**DEMAND IS FUTILE AS TO DEFENDANTS HENNESSEY AND MYLOD**

127.     Defendant Hennessy was appointed as Vroom's CEO effective June 8, 2016, and Defendant Hennessy had served previously served as the CEO of priceline.com, an operating business of The Priceline Group, after previously holding various positions within the Priceline organization. At the same time that Vroom announced Hennessy's appointment as CEO, the Company also announced that Defendant Mylod, former CFO and Vice Chairman of The Priceline Group and a then-current Vroom board member, had been named Non-Executive Chairman of the Vroom Board of Directors. Defendants Hennessy and Mylod had previously worked together at The Priceline Group for over a decade. Given Defendants Hennessy and Mylod's longstanding affiliations with each other, demand is futile as to these defendants lack independence from one

another.

**DEMAND IS EXCUSED AS TO DEFENDANTS MYLOD AND LANG BECAUSE AS
MEMBERS OF THE AUDIT COMMITTEE THEY FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

128.    Defendants Mylod and Lang, as members of the Audit Committee during the
Relevant Period, participated in and knowingly approved the filing of false financial statements
and allowing the Company to repeatedly make other false and misleading statements to the
investing public. More specifically, as members of the Audit Committee, Defendants Mylod and
Lang were obligated to review the Company's annual and quarterly reports to ensure their
accuracy. Instead, Defendants Mylod and Lang as members of the Audit Committee, failed to
ensure the integrity of the Company's financial statements and financial reporting process, the
Company's systems of internal accounting and financial controls and other financial information
provided by the Company, as required by the Audit Committee Charter. For this reason, demand
is futile as to Defendants Mylod and Lang.

## FIRST CLAIM
**Against Defendants Hennessey, Jones, Mylod, Dahnke, Farello, Lang, and O'Shaughnessy
For Violations of Sections 10(b) and 21(D) of the Exchange Act**

129.    Plaintiff incorporates by reference and realleges each and every allegation set forth
above, as though fully set forth herein.

130.    Defendants Hennessey, Mylod, Jones, Dahnke, Farello, Lang, and O'Shaughnessy
have been named as defendants in the Securities Class Action.

131.    Defendants Hennessey, Mylod, Jones, Dahnke, Farello, Lang, and O'Shaughnessy
had a duty not to defraud the investing public by the dissemination of materially false and
misleading press releases and the dissemination of materially false and misleading financial
statements during the Relevant Period.

132.     Although Plaintiff does not adopt the allegations of wrongdoing that are alleged in the Securities Class Actions as his own, if the Company is deemed to have violated the federal securities laws, and incurs damages therefore, such damages should not be disproportionately borne by the Company, and these individual defendants are liable to the Company for contribution pursuant to sections 10(b) and 21(D) of the Exchange Act.

133.     Accordingly, Plaintiff asserts this claim derivatively for contribution, as provided by statute.

### SECOND CLAIM
**Breach of Fiduciary duty Against the Individual Defendants**

134.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

135.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Vroom's business and affairs.

136.     Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

137.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Vroom.

138.     In breach of their fiduciary duties owed to Vroom, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, inter alia, that: (a) Vroom's inventory growth had far outpaced the capabilities of its existing sales and support personnel,

creating a logistical bottleneck that threatened the Company's profits, the value of its existing inventory and its ability to achieve positive cash flows; (b) Vroom's lack of adequate sales and support staff had resulted in a degraded Customer Experience and lost sales opportunities; (c) as a result of (a) and (b) above, Vroom needed to invest tens of millions of dollars in bolstering its sales and support and logistics networks, materially impairing the Company's short-term profitability; and (d) as a result of (a)-(c) above, Vroom was poised to suffer accelerating losses and increased negative cash flows, despite a robust online used car market.

139.    The Individual Defendants failed to supervise, and to exert internal controls over, and consciously disregarded responsibilities involving the Company.

140.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Vroom has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

141.    Plaintiff, on behalf of Vroom, has no adequate remedy at law.

**PRAYER FOR RELIEF**

**FOR THESE REASONS**, Plaintiff demands judgment in the Company's favor againstall Individual Defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of Vroom, and that Plaintiff is an adequate representative of the Company;

B.    Declaring that the Individual Defendants have breached their fiduciary duties and committed other violations of law;

C.    Awarding to Vroom the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-

judgment interest thereon;

     D.     Directing Vroom and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and protect Vroom and its stockholders from a repeat of the damaging events described herein;

     E.     Awarding Vroom restitution from the Individual Defendants;

     F.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

     G.     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: January 28, 2022

Respectfully submitted,

**BRAGAR EAGEL & SQUIRE, P.C.**

By: /s/ *Garam Choe*
Garam Choe
810 Seventh Street, Suite 620
New York, NY 10019
Telephone: (212) 308-5858
Facsimile: (212) 214-0506

*Attorneys for Plaintiff*

**OF COUNSEL:**

HYNES & HERNANDEZ, LLC
Michael Hynes
Ligaya T. Hernandez
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
Telephone: (484) 875-3116

**VERIFICATION**

I, Brady McDonough, hereby verify that I have authorized the filing of the attached Verified Stockholder Derivative Complaint, that I have reviewed the Verified Stockholder Derivative Complaint and that the facts therein are true and correct to the best of my knowledge, information and belief. I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 27, 2022

*Brady McDonough*
Brady McDonough (Jan 27, 2022 10:53 CST)

Brady McDonough